**FILED**

**OCT 26 2017**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> v. <br><br> **MOBEEN AHMED,** <br><br> Defendant. | Criminal No.: 17-cr-190 <br><br> **UNDER SEAL** <br><br> Violations: <br><br> (Conspiracy) <br> 18 U.S.C. § 371 <br><br> (Violation of the International Emergency Economic Powers Act) <br> 50 U.S.C. § 1705 |

**STATEMENT OF OFFENSE**

**People and Entities**

1.   From March 2007 through August 2014, Mobeen Ahmed was employed by an international financial institution ("the Bank") in the United Arab Emirates ("UAE"). The Bank was headquartered in London, United Kingdom, and had branch offices around the world, including in Dubai, UAE, and in New York, NY. The Bank's branch office in New York provided wholesale banking services, including United States dollar ("USD") clearing services for international wire transactions. Ahmed was employed as a Relationship Manager at the Bank's Dubai branch. Ahmed's responsibilities included fostering and developing banking relationships with the Bank's small- and medium-sized business customers in Dubai.

2.   Person A was employed as a Treasury Sales Manager at the Bank's Dubai branch from 2008 through 2014. Person A's job responsibilities included managing foreign currency sales for small- and medium-sized business customers, including USD currency sales.

3.   Person B was an Iranian national who controlled two business organizations in the

UAE that were customers of the Bank's Dubai branch. Business Organization #1 was a customer of the Bank's Dubai branch from approximately December 2006 through February 2011. Business Organization #2 was a customer of the Bank's Dubai branch from approximately February 2011 through August 2011. Business Organizations #1-2 conducted USD transactions through their accounts at the Bank.

4. Person C was an Iranian national who controlled at least four business organizations in the UAE that were customers of the Bank's Dubai branch. Business Organization #3 was a customer of the Bank's Dubai branch from approximately December 2009 through January 2011. Business Organization #4 was a customer of the Bank's Dubai branch from approximately December 2010 through April 2011. Business Organization #5 was a customer of the Bank's Dubai branch from approximately January 2011 through September 2011. Business Organization #6 was a customer of the Bank's Dubai branch from approximately September 2011 through December 2011. Business Organizations #3-6 conducted USD transactions through their accounts at the Bank.

5. Persons D, E, and F were Turkish nationals who controlled two business organizations in the UAE that were customers of the Bank's Dubai branch. Business Organization #7 was a customer of the Bank's Dubai branch from approximately October 2009 through October 2011. Business Organization #8 was a customer of the Bank's Dubai branch from approximately April 2011 through August 2011. Business Organizations #7-8 conducted USD transactions through their accounts at the Bank.

### United States Sanctions on Iran

6. The International Emergency Economic Powers Act, Sections 1701 to 1706 of Title

50 of the United States Code ("IEEPA"), granted to the President of the United States a broad spectrum of powers necessary to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." Title 50, United States Code, Section 1701(a).

7. The President exercised these IEEPA powers through Executive Orders that imposed economic sanctions to address particular emergencies and delegate IEEPA powers for the administration of those sanctions programs. On March 15, 1995, President William J. Clinton issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat." President Clinton followed this with Executive Order No. 12959, issued on May 6, 1995, which imposed comprehensive trade and financial sanctions on Iran. These sanctions prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran of any goods, technology, or services from the U.S. or U.S. persons, wherever located. This includes persons in a third country with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, transshipment, or re-exportation, directly or indirectly, to Iran or the Government of Iran. On August 19, 1997, President Clinton issued Executive Order No. 13059, consolidating and clarifying Executive Order Nos. 12957 and 12959 (collectively, the "Executive Orders"). The most recent continuation of this national emergency was executed on January 13, 2017. 82 Fed. Reg. 6187 (Jan. 13, 2017).

8. The Executive Orders authorized the U.S. Secretary of the Treasury to promulgate

rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions and Sanctions Regulations ("ITRs"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders. With the exception of certain exempt transactions, the ITRs prohibited, among other things, U.S. depository institutions from servicing Iranian accounts and directly crediting or debiting Iranian accounts, without a specific license from the Office of Foreign Assets Control ("OFAC"). The ITRs also prohibited unlicensed transactions by any U.S. person who evades or avoids, has the purpose of evading or avoiding, or attempts to evade or avoid the restrictions imposed under the ITRs.

9.  OFAC, during the relevant period, was located in the District of Columbia.

**The Conspiracy**

10. Between in or about 2007 and in or about 2011, Ahmed willfully conspired with numerous people and entities, including Persons A-F and Business Organizations #1-8, and other individuals and business organizations, to commit offenses against the United States, and to defraud the United States. Specifically, Ahmed circumvented United States financial sanctions against Iran by causing certain financial services to be exported from the United States to Iran without the requisite license from OFAC, in violation of the ITRs and IEEPA. Ahmed also defrauded the United States by interfering with the enforcement of laws and regulations prohibiting the export or supply of financial services from the United States to Iran without the requisite license from OFAC. These violations resulted in hundreds of transactions totaling millions of USD on behalf of the Bank's business customers of the Dubai branch, knowing that those business customers (including Business Organizations #1-8, controlled by Persons B, C, D, E, and F) were

operating from Iran and/or doing USD business with Iranian entities, without a license from OFAC.

11. At all times relevant to the offense conduct, Ahmed was the Relationship Manager for Business Organizations #1-8, controlled by Persons B, C, D, E, and F. Person A helped facilitate foreign currency transactions, including in USD, for all of these entities. Ahmed and Person A both knew that each of these business organizations either operated from Iran, or transacted USD business with Iranian entities.

12. Ahmed and Person A counseled Persons B, C, D, E, and F on ways to structure financial transactions that would not cause the Bank to suspect that the transactions violated United States laws, including IEEPA. For example:

    a. On or about March 9, 2011, Ahmed spoke with Person B by phone and instructed him how to avoid future scrutiny of transactions by the Bank's compliance officials. Among other things, Ahmed advised that Person B should send payments from his business accounts only to other business accounts and not to accounts held by individuals. Ahmed further advised Person B to tell compatriots to use their personal accounts (as opposed to business accounts) in order to send payments to other individuals.

    b. On or about June 27, 2010, Ahmed spoke with Person C by phone and counseled him to avoid depositing large checks or checks from Iranian banks, and instead to deposit small checks and route funds from Iranian banks through another UAE institution before depositing them at the Bank.

    c. On or about February 27, 2011, Ahmed spoke with Person E by phone and

suggested that Person E avoid withdrawing large amounts of cash from his business account, and instead use other methods such as checks to conduct financial transactions, as a means to better avoid scrutiny by the Bank's compliance officials.

13. Ahmed and Person A provided false and misleading information to Bank officials intended to disguise known ties to Iran by Persons B, C, D, E, and F, and Business Organizations #1-8. For example:

  a. On or about August 24, 2008, Ahmed responded to a Bank compliance inquiry about Business Organization #1 by stating, among other things, that Business Organization #1 did not have any branches outside the UAE without disclosing that Business Organization #1 currently or formerly had a factory in Iran.

  b. On or about April 9, 2009, Ahmed falsely stated on an internal Bank customer due diligence review form that there were no sanctions concerns associated with Business Organization #1's account.

  c. On or about August 19, 2010, Ahmed responded to a Bank compliance inquiry about Business Organization #3 by stating that Business Organization #3 had no branches outside of the UAE, despite knowing and declining to disclose significant connections between Business Organization #3 and Iran.

  d. In July 2010, Ahmed responded to various internal Bank inquiries regarding increased numbers of transactions conducted by Business Organization #7. Ahmed stated that Business Organization #7 was based in Dubai and that the reason for the increased transactions was because of preferential rates. Ahmed declined to inform Bank compliance officials that correspondent banks had raised concerns

about Business Organization #7's Iran connections, and declined to share that Ahmed had counseled Person E (a controller of the account) to avoid scrutiny by not sending payments directly to Iran, and to instead use an intermediary financial institution.

14. Ahmed and Person A facilitated access to the Bank by Persons B, C, D, E, F, after various of their business accounts had been shut down by Bank compliance officials due to Iran sanctions concerns. Ahmed and Person A did this by providing USD banking services to newly-opened business organizations controlled by Persons B, C, D, E, and F, without disclosing to Bank compliance officials that these individuals and their prior accounts had known ties to Iran. For example:

   a. On or about March 23, 2011, Ahmed arranged to become the Relationship Manager for Business Organization #2, which was controlled by Person B, despite that Business Organization #1's account (also controlled by Person B) had been closed a month earlier due to Iran sanctions concerns. Ahmed knew that Business Organization #2 would continue the same business activities as Business Organization #1, but under a different name. Ahmed did not disclose to Bank compliance officials the connections between the closed account for Business Organization #1 and the newly-opened account for Business Organization #2.

   b. On or about December 23, 2010, Ahmed arranged to become the Relationship Manager for Business Organization #4, which was controlled by Person C, despite that Business Organization #3's account (also controlled by Person C) was in the process of being closed due to Iran sanctions concerns. Ahmed knew that Business

Organization #4 would continue the same business activities as Business Organization #3, but under a different name. Ahmed did not disclose to Bank compliance officials the connections between Business Organization #3 (which was closed on or about January 12, 2011) and Business Organization #4 (which continued to conduct USD transactions for several months into 2011).

15. Ahmed knew that the above-described conduct would result in USD transactions being processed by the Bank's branch in New York in violation of United States law.

16. Ahmed engaged in this misconduct willfully and with knowledge that it was in violation of United States law. He did so in order to generate revenue for the Bank and to maintain his employment.

17. Ahmed concealed his misconduct from Bank compliance officials, but disclosed some of the misconduct to his supervisors in order to assure them of upcoming revenue for the Bank.

18. A license from OFAC was required for at least some of the USD transactions conducted by Business Organizations #1-8, but a license was neither sought nor obtained.

Respectfully Submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY

By: _____
Alessio D. Evangelista
Principal Assistant United States Attorney
D.C. Bar No. 456715
(202) 252-6620

_____
Peter C. Lallas
New York Bar No. 4290623
Michael Friedman
New York Bar No. 4297461
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-6765 (Friedman)
(202) 252-6879 (Lallas)


KENNETH A. BLANCO
ACTING ASSISTANT ATTORNEY GENERAL

By: _____
Deborah Connor
Acting Chief
Money Laundering and Asset Recovery Section
D.C. Bar No. 452414
(202) 514-1263

_____
Jennifer Wine
D.C. Bar No. 976005
Trial Attorney, Bank Integrity Unit
Money Laundering and Asset Recovery Section
1400 New York Ave., NW
Washington, DC 20005
(202) 616-2595

9

**Defendant's Agreement**

After consulting with my attorney, Daniel Gitner, Esq., and Abigail Rosen, Esq., and pursuant to the plea agreement entered into between me, Mobeen Ahmed, and the United States Attorney's Office for the District of Columbia and the Department of Justice's Money Laundering and Asset Recovery Section, I hereby state and agree that the foregoing Statement of Offense is true and accurate. No one has forced or compelled me to agree to this Statement of Offense. I have agreed to this Statement of Offense because the facts set forth above are true and accurate to the best of my knowledge.

24/10/17
Date

_____
Mobeen Ahmed
Defendant

**Attorney's Acknowledgment**

I am Mobeen Ahmed's attorney. I have carefully reviewed the foregoing Statement of Offense with him. To my knowledge, his decision to stipulate and agree to these facts is an informed and voluntary one.

10/24/17
Date

_____
Daniel Gitner, Esq.
Abigail Rosen, Esq.
Counsel for the Defendant